UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

AMAZON.COM SERVICES LLC,

                Plaintiff,

v.

DIGITAL DIRECT AND MORE, INC., ARI CAMEO, and SHOSHANA OSTRON,

                Defendants.

**MEMORANDUM & ORDER**
24-CV-07617 (HG)

**HECTOR GONZALEZ**, United States District Judge:

Plaintiff Amazon.com Services LLC sued Defendants Digital Direct and More, Inc. ("DDAM"), Ari Cameo, and Shoshana Ostron, principally alleging that they aided and abetted a fraud carried out on Amazon's third-party sales platform. Defendants have moved to dismiss. For the reasons explained below, their motion to dismiss is DENIED.

## BACKGROUND

The Court draws the following facts from the Complaint. ECF No. 1 ("Compl."). The Court "recite[s] the substance of the allegations as if they represent[] true facts, with the understanding that these are not findings of the [C]ourt, as [I] have no way of knowing at this stage what are the true facts." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021).[1]

DDAM was formed in 2014 and sold electronics on Amazon's platform. Compl. ¶ 13. Amazon terminated DDAM's account because DDAM violated various Amazon policies, including selling knockoff products. *Id.* Defendant Ari Cameo was DDAM's sole owner until

---

[1] Unless otherwise indicated, when quoting cases and the parties' papers, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted. The Court refers to the pages assigned by the Electronic Case Files system ("ECF"), except when quoting bankruptcy court documents, where the Court uses the page number in the document footer.

September 2016, when his brother, non-Defendant David Cameo, became a 50% shareholder, and the two owned DDAM together until 2018.[2]  *Id.* ¶¶ 15–16.  DDAM did not maintain books nor hold corporate meetings, and it purportedly issued paper invoices.  *Id.* ¶ 18.

At around the time David acquired his stake in DDAM, Shoshana—who is David's wife and Ari's sister-in-law—started working at DDAM.  *Id.* ¶ 19.  Shoshana handled customer service for DDAM and her DDAM salary was her sole source of income from 2016 to 2022.  *Id.* ¶¶ 20–21.  She and David were the signatories on DDAM's bank records and controlled transfers of DDAM's funds.  *Id.* ¶ 22.  In March 2018, David transferred his DDAM shares back to Ari for $1.  *Id.* ¶ 23.  Nevertheless, David remained involved with the business, such as by opening DDAM bank accounts in March and June 2018, where he identified himself as DDAM's "owner."  *Id.* ¶ 24.  In 2018, Shoshana started to earn $400,000 from DDAM.  *Id.* ¶ 25.

Back in April 2016, David had formed Jersey Cameras 2, Inc. ("JC2"), to sell electronics online.  *Id.* ¶ 27.  David is JC2's sole officer, director, and shareholder.  *See id.* ¶ 28.  Like DDAM, it apparently lacked business records and did not hold corporate meetings.  *Id.* ¶ 30.  David is the sole signatory on JC2's bank account and was in control of transferring its funds.  *Id.* ¶ 29.  In violation of Amazon's seller agreement, David created JC2 in order to acquire an existing Amazon seller account, and JC2 became a third-party seller on Amazon.  *Id.* ¶ 31.  David operated JC2 primarily out of his home and handled orders placed by Amazon customers.  *Id.* ¶ 32.  In 2018, JC2's only revenue source was the Amazon store.  *See id.* ¶¶ 33–34.

To protect customer trust in the Amazon store, Amazon operates a guarantee program for products sold by third-party sellers.  *Id.* ¶ 36.  If a customer receives an order different from what she expects or that is late, and the third-party seller does not respond to a request for a refund,

---

[2]  For the sake of clarity, the Court will refer to the brothers as Ari and David, respectively, and for consistency's sake, will also use Defendant Ostron's first name, Shoshana.

Amazon reviews the customer's claim and issues a refund directly. *Id.* Amazon requires third-party sellers to agree that Amazon can deduct such refunds from a seller's account balance if Amazon determines that the seller was at fault. *Id.* ¶ 37. But if the third-party seller's account lacks adequate funds for Amazon to issue the refund to the customer, Amazon pays for the refund itself and requires seller to reimburse it. *Id.* When David registered third-party seller accounts for JC2, he agreed to these Amazon policies. *Id.*

In December 2018, Amazon discovered that David was using JC2 to carry out a so-called "hit-and-run" fraud, by which a seller accepts customer funds, fails to deliver the product, and then "disappear[s] with customer[] money," leaving the customer without recourse. *Id.* ¶ 38. In the second half of 2018, David listed, sold, and claimed to ship high-value electronics like drones, cameras, and laptops through JC2's third-party seller accounts, but customers actually received low-value products like flash drives or nothing at all. *Id.* ¶¶ 39–40. David confirmed shipments on JC2's account, indicating to Amazon that JC2 had in fact shipped or was shipping customers' packages, but certain customers confirmed that David and JC2 did not actually ship the products or shipped the wrong products. *Id.* ¶ 41. Amazon had started receiving customer complaints in October 2018 and received thousands of such complaints through December 2018. *Id.* ¶ 43. When customers complained to David and JC2, customers received no responses, or David and JC2 disputed issuing the refunds. *Id.* ¶ 44. In November and December 2018, JC2's sales more than doubled relative to the prior months, which is a common pattern in hit-and-run schemes as the seller attempts to collect as much money as quickly as possible. *Id.* ¶ 42.

Amazon deactivated JC2's seller accounts on December 14, 2018, but Amazon had already disbursed sales proceeds to JC2's bank account because David had confirmed to Amazon that the shipments had been made. *Id.* ¶¶ 45–46. When JC2 received payments from Amazon,

David immediately transferred that money into DDAM's bank account. *Id.* ¶ 47. Specifically, between February 2018 and December 2018, each time Amazon made a disbursement to JC2, David immediately transferred those funds into DDAM, leaving nothing for JC2 to fund ongoing operations, including shipping goods to customers and issuing refunds. *Id.* ¶ 50. Between February 28, 2018, and December 31, 2018, JC2 received $6,957,185 from Amazon, and nearly all of that money, $6,957,086, was transferred into DDAM. *Id.* ¶ 51.

Meanwhile, Amazon customers submitted claims through Amazon's refund program, but because David did not issue refunds or JC2 lacked sufficient funds, Amazon issued those refunds on its own. *Id.* ¶ 48. During the time period between September and December 2018, in which David was allegedly carrying out the scheme, he transferred more than $3 million from JC2 into DDAM. *Id.* ¶ 52. That took place over 23 separate transfers identified in the Complaint. *See id.* By transferring all funds out of JC2 and into DDAM, JC2 was unable to pay any customer refunds. *Id.* ¶ 54. In all, Amazon paid at least $2,183,162.40 through its guarantee program to David's customers, and David has never reimbursed Amazon. *Id.* ¶ 49.

JC2 did not receive consideration for its transfers to DDAM. *Id.* ¶ 55. David claimed that DDAM was JC2's exclusive inventory supplier pursuant to an "Exclusivity Agreement" between David and Ari. *Id.* That agreement was executed on March 1, 2018, the same day David transferred his ownership interest in DDAM to Ari. *Id.* The Exclusivity Agreement purported to oblige JC2 to purchase all inventory from DDAM; in exchange, DDAM would receive JC2's payments from Amazon. *Id.* ¶ 56. The Exclusivity Agreement does not reference the pricing of goods sold between the two companies and does not obligate DDAM to sell merchandise to JC2. *Id.* There is nothing to show that JC2 actually purchased any inventory from DDAM. *See id.* ¶¶ 57–59.

4

Back in 2016, there was another entity formed called Cameo Distribution, Inc., which David also owned and operated. *Id.* ¶ 26. Although David said Ari owned 15% of Cameo Distribution, David's federal income tax return from 2018 indicated that he was the sole owner. *Id.* Between February and December 2018, $3,388,841 was transferred from DDAM to Cameo Distribution; $872,437 of that was transferred during the alleged hit-and-run period of October to December 2018. *See id.* ¶¶ 62–63. In 2018, funds from DDAM's and Cameo Distribution's bank accounts were used to personally benefit David, Ari, and Shoshana. *Id.* ¶ 65. From June to November 2018, $410,000 was transferred from Cameo Distribution to David and Shoshana's joint account. *Id.* ¶ 66. From May to July 2018, DDAM and Cameo Distribution funds were similarly transferred to various limited liability companies, which invested in real estate and were partially owned by Ari and Shoshana (the "Real Estate LLCs"). *Id.* ¶¶ 67–68. The Real Estate LLCs each maintained bank accounts at the same bank and were controlled by David. *Id.* ¶ 69. Between May and July 2018, money was transferred from DDAM's and Cameo Distribution's bank accounts to purchase investment properties through the Real Estate LLCs. *See id.* ¶¶ 70–74. In 2018, additional money was transferred out of Cameo Distribution for the benefit of David, Ari, and Shoshana, which was used for the purchase of vehicles, jewelry, and vacations. *See id.* ¶¶ 75–76.

DDAM, Shoshana, and Ari assisted with moving the funds received by JC2 from Amazon for their personal benefit. *Id.* ¶ 78. Specifically, as part of the scheme, David and Shoshana were signatories on DDAM's bank account, David was a signatory for Cameo Distribution's bank accounts, and Ari was the owner of DDAM and a signatory on its bank account. *Id.* ¶ 80.

In October 2019, Amazon filed an arbitration against David related to the alleged hit-and-run scheme. *Id.* ¶ 81. Before the arbitrator ruled on Amazon's summary judgment motion, David filed for Chapter 7 bankruptcy. *Id.* ¶ 81–82. Amazon initiated an adversary proceeding against David, seeking a money judgment for amounts owed to Amazon. *Id.* ¶ 83; *see also Amazon.com Servs. LLC v. Cameo* (*In re Cameo*), Ch. 7 Case No. 21-41803, Adv. No. 21-01180 (Bankr. E.D.N.Y. filed Oct. 12, 2021). Amazon prevailed. Compl. ¶¶ 85–87. Specifically, in an April 30, 2024, memorandum decision, Bankruptcy Judge Mazer-Marino granted summary judgment to Amazon, concluding that "Amazon is entitled to declaratory judgment that its claims against David Cameo resulted from actual fraud and are nondischargeable." *See Amazon* Bankr. ECF No. 83 at 37.[3] Judge Mazer-Marino ordered the entry of a $2,183,162.40 judgment for Amazon. *Id.*; *see also Amazon* Bankr. ECF No. 92 (Judgment).[4]

Plaintiff filed the Complaint on October 31, 2024. After pre-motion practice, Defendants filed their motion to dismiss on January 22, 2025. *See* ECF No. 16; ECF No. 16-1 ("Mot."). Plaintiff filed its opposition on February 21, 2025. *See* ECF No. 19 ("Opp."). Defendants filed their reply on March 7, 2025. *See* ECF No. 20 ("Reply").

## LEGAL STANDARD

"In order to survive a motion to dismiss, a plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 99 (2d Cir. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is plausibly alleged 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matzell v.*

---

[3]   References to "*Amazon* Bankr. ECF" go to the adversary proceeding (No. 21-01180).

[4]   David has appealed the bankruptcy court's decision. *See Cameo v. Amazon.com Servs. LLC*, No. 24-cv-03628 (E.D.N.Y. filed May 15, 2024).

*Annucci*, 64 F.4th 425, 433 (2d Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In making this assessment, the court must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *VR Glob. Partners, L.P. v. Petróleos de Venez., S.A.*, No. 24-1176-cv, 2024 WL 4891271, at *2 (2d Cir. Nov. 26, 2024).

## DISCUSSION

Plaintiff advances six causes of action: (i) fraudulent transfer under former Section 276 of the New York Debtor and Creditor Law ("DCL")[5] against DDAM and Ari, and in the alternative, fraudulent transfer under former DCL Sections (ii) 273, (iii) 274, and (iv) 275. Plaintiff also accuses DDAM, Ari, and Shoshana of (v) aiding and abetting fraud and (vi) civil conspiracy. Defendants move to dismiss all claims, principally arguing that a settlement in David's bankruptcy case released or has preclusive effect with respect to the claims at issue here. *See* Mot. at 9–16. They also contend that the fifth and sixth causes of action are not adequately pled. *See id.* at 16–20. Finally, they claim that the sixth cause of action must be dismissed as duplicative of the fifth. *See id.* at 20–21. The Court addresses each argument in turn.

### I.     Bankruptcy Settlement

In David's bankruptcy case, the Bankruptcy Trustee, David J. Doyaga, Sr., brought an adversary action against Ari and Shoshana. *See Doyaga v. Cameo* (*In re Cameo*), Ch. 7 Case No. 21-41803, Adv. No. 22-01053 (Bankr. E.D.N.Y. filed July 11, 2022). The Trustee alleged that David transferred his 50% interest in DDAM to Ari for no consideration and for the purpose

---

[5]     New York's Uniform Voidable Transaction Act ("UVTA") repealed certain sections of the DCL on April 4, 2020, but "the UVTA applies only to transfers made or obligations incurred on or after its effective date," and so the old DCL continues to apply in this case. *See Saadeh v. Kagan*, No. 24-163-cv, 2025 WL 799262, at *2 n.1 (2d Cir. Mar. 13, 2025); *see also* Compl. at 19 n.1. Defendants do not contend otherwise.

of defrauding David's creditors. *See Cameo* Bankr. ECF No. 117 ¶¶ 25, 33. He also alleged that Shoshana received an inflated salary after the transfer of David's interest in DDAM to Ari, which operated as a "front" "to transfer [David]'s distributions and salary to [Shoshana] so as to shield [David]'s money from his creditors." *Id.* ¶ 45. On August 8, 2023, the Trustee, Ari, and Shoshana settled those claims. *See Cameo* Bankr. ECF Nos. 139; 139-1 (the "Settlement Agreement" or "SA"); 144 (Order Approving Settlement).[6] Defendants claim that Settlement Agreement bars the claims in this case.[7] The Court disagrees.

        A.     *Settlement Agreement and Release*

Defendants appear to ground their argument primarily in preclusion doctrines, but their submission suggests a freestanding argument that the Trustee released the claims in this case. *See* Mot. at 9–11. To the extent Defendants are indeed making such an argument, the Court rejects it. As just mentioned, the Settlement Agreement resolved an adversary proceeding brought by the Trustee against Ari and Shoshana. *See* SA at 1. Principally in exchange for $460,000, Ari and Shoshana received the following release:

> the Trustee and the estate, his respective representatives, agents, administrators, successors and assigns (collectively, in this paragraph, the "Estate Releasors") each shall conclusively be deemed to have released the Defendants, and their respective representatives, agents, administrators, successors, alter-egos and assigns from all actions, causes of action, suits, which against the Defendants, the Estate Releasors, Estate Releasors' representatives, agents, administrators, successors, and assigns

---

[6]    References to the "*Cameo* Bankr. ECF" go to the Chapter 7 docket (Case No. 21-41803).

[7]    Before proceeding, there are two preliminary matters to address. First, Defendants' challenge based on the release is best understood in the context of this case as raising a merits rather than a jurisdictional defense. The Settlement Agreement did not moot this case—and therefore deprive the Court of subject-matter jurisdiction—because, as discussed further below, Plaintiff "seeks relief beyond what was provided in [the] settlement" and the interpretation of the Settlement Agreement "is a contract-law question that goes to the merits." *Bensky v. Indkye*, 743 F. Supp. 3d 586, 592 (S.D.N.Y. 2024). Second, the Court may take judicial notice of, and therefore consider on a motion to dismiss, the Settlement Agreement and other documents filed in David's bankruptcy case and referenced by the parties. *See Campos v. Aegis Realty Mgmt. Corp.*, No. 19-cv-2856, 2020 WL 433356, at *4 (S.D.N.Y. Jan. 28, 2020).

8

> ever had or may have had, now have or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this Settlement Agreement.

*Id.* ¶ 7 (emphasis in original). Defendants initially claim that the Settlement Agreement "precludes Plaintiff's counts one through four because they are based on the same facts and statutes as the Trustee's claim against the same parties." Mot. at 10. That misses the mark. For one, the Trustee did not bring a claim against DDAM, so the parties are not the same. More fundamentally, Defendants make that argument at too high a level of generality. Amazon did not bring a claim against Ari and Shoshana in the bankruptcy proceeding. That setup is materially different from the one in Defendants' authority, *Shaffer v. Roffer*, in which the plaintiffs in the civil action "participated in and sought the Bankruptcy Court's approval of the settlement" releasing their fraudulent conveyance claim. 735 N.Y.S.2d 749 (N.Y. App. Div. 2002).

Defendants then turn to the release, seizing on the "all actions" language just mentioned. *See* Mot. at 10. But who released their claims? The Estate Releasors. Amazon was definitionally not an Estate Releasor. SA ¶ 7. And the Settlement Agreement does not purport to release third parties' (*e.g.*, Amazon's) claims against Ari and Shoshana. This outcome makes sense on two levels. First, the Settlement Agreement resolved Trustee's adversary proceeding against Ari and Shoshana. Under New York law, the release is "limited to those claims within the contemplation of the parties at the time." *See In re Arctrade Fin. Techs., Ltd.*, 424 B.R. 59, 69 (Bankr. S.D.N.Y. 2009). The Settlement Agreement makes clear that "those claims" were the ones asserted by the Trustee in the adversary proceeding concerning David's DDAM interest and Shoshana's salary. *See* SA at 2. They were not Amazon's claims, asserted in this case, related to David's movement of funds out of JC2 and into DDAM, and Defendants' aiding and abetting of those fraudulent transfers. *See* Compl. ¶¶ 89–131.

9

Second, this result is sensible in the broader bankruptcy context. The Trustee "st[ood] in the shoes of the debtor," David. *Wornick v. Gaffney*, 544 F.3d 486, 490 (2d Cir. 2008). The Trustee could not have brought aiding and abetting and civil conspiracy claims (as described in Counts Five and Six) against Defendants here. The rights asserted in those causes of action are particularized to Amazon and not derivative of injury to David's estate; Amazon is therefore "exclusively" entitled to pursue them. *See In re Tronox Inc.*, 855 F.3d 84, 99 (2d Cir. 2017).

The question is somewhat more complicated with respect to the fraudulent transfer claims in Counts One to Four. Plaintiff appears to concede that the Trustee could have brought these claims in the bankruptcy case. *See* Opp. at 15–16. It argues, however, that these potential claims reverted back to Amazon because the Trustee did not pursue them within two years of the commencement of David's bankruptcy case, or by July 13, 2023, pursuant to 11 U.S.C. § 546(a)(1)(A). *See id.* at 16; *see also In re Tribune Co. Fraudulent Conv. Litig.*, 499 B.R. 310, 322 (S.D.N.Y. 2013) ("[W]hen the two-year limitation on trustee avoidance claims expires, the claims automatically revert."). For their part, Defendants argue that "the trustee enforced Plaintiff's claims" in a timely avoidance action (*i.e.*, the Trustee's case against Ari and Shoshana). *See* Reply at 5. The parties speak past each other, but Plaintiff has the better argument. It is undisputed that the Trustee did not pursue the specific DDAM transfers at issue in this case in the bankruptcy court. *See* Opp. at 16. By initiating one fraudulent transfer action, a bankruptcy trustee does not vitiate all other conceivable fraudulent transfer actions; rather, the inquiry focuses on the specific "claims." *See In re Tribune Co.*, 499 B.R. at 321–22. Here, by the time the Settlement Agreement was executed, the fraudulent transfer claims Plaintiff seeks to assert in this case had reverted to it. In other words, the two-year period expired on July 13, 2023. But the Settlement Agreement was not executed until nearly two months later on August

10

8, 2023.  Thus, because the Trustee's "exclusive right" to control these specific claims had already expired, he necessarily could not have compromised them.  *See id.* at 322.  This understanding is confirmed by the Settlement Agreement itself, which provides that the claims asserted in the Trustee's avoidance action, resolved by the Settlement Agreement, were "all of the possible claims belonging to [David]'s estate."  SA at 2.  Therefore, the Settlement Agreement did not release the claims in this action.

B.     Collateral Estoppel and *Res Judicata*

Defendants also argue that the entire Complaint is barred by the doctrine of collateral estoppel and that specific claims are barred by the doctrine of *res judicata*.  *See* Mot. at 11–16.  The parties do not wrestle with the specific issue of whether federal or New York preclusion law applies with respect to these bankruptcy court proceedings, but Defendants say New York applies, *see* Mot. at 13 n.2, and Plaintiff at least does not explicitly contest this point, *see* Opp. at 20–23.  Plus, Defendants' motion is based on the Settlement Agreement, which explicitly provides that New York law controls.  *See* SA ¶ 17.  So, the Court will apply New York law, *see, e.g.*, *Campos*, 2020 WL 433356, at *4 & n.5, but observes that neither party claims that there is a relevant distinction, and there is none, between the two bodies of law either generally or for the purposes of this motion.  *See Koch v. Bobcat of N.Y., Inc.*, No. 19-cv-07081, 2025 WL 746023, at *5 n.10 (E.D.N.Y. Mar. 7, 2025); *see also Twersky v. Yeshiva Univ.*, 112 F. Supp. 3d 173, 179 (S.D.N.Y. 2015) (applying federal law to dismissed pendent state law claims but observing that "[t]here is no material difference between federal and New York State preclusion principles"), *aff'd*, 637 F. App'x 48 (2d Cir. 2016).

The Court begins with collateral estoppel.  "Under New York law, collateral estoppel bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior

11

action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." *Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006). Here, Defendant's argument is as follows: (1) the "Trustee . . . had the exclusive authority to pursue or settle any and all claims belonging to David['s] . . . estate"; (2) Plaintiff was a creditor in privity with the Trustee; (3) the Trustee could have pursued all of the claims now asserted by Plaintiff; and (4) Plaintiff had a full and fair opportunity to litigate in the bankruptcy court. *See* Mot. at 14. The Court is unpersuaded.

As a preliminary matter, Defendants rely on two incorrect assumptions in need of correction. First, although the Trustee had a limited period of time to bring fraudulent conveyance claims, those claims are "not treated as property of the bankruptcy estate because the debtor has no personal recourse against the transferee in a fraudulent conveyance." *In re Tribune Co.*, 499 B.R. at 321. Second, the aiding and abetting and conspiracy claims asserted here were not estate property. According to Defendants, the Trustee of David's estate would have been permitted to seek to hold Defendants liable for participating in David's own fraud. That is not right, and it again shows why these specific claims belonged and continue to belong to Amazon.

It flows from the above that "identical" issues were not resolved in David's bankruptcy case so as to permit the application of collateral estoppel here. As already explained, the claims in this case relate to transfers out of JC2 and into DDAM, which were not at issue in the bankruptcy case. *See, e.g.*, Compl. ¶ 90. And the aiding and abetting and conspiracy claims were not even available to Amazon as a creditor in that case. So the issues in the bankruptcy case were neither identical nor actually litigated. *Cf. Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 289 (2d Cir. 2002) (declining to apply collateral estoppel where stipulations of settlement lacked "specific findings" on the relevant issue). Perhaps recognizing this problem, Defendants

12

rely heavily on the idea that "[c]ollateral estoppel prevents relitigation of issues . . . that . . 'were raised or *could have been raised*' in a prior action" by a party or a party in privity with it.  *See* Mot. at 13 (emphasis added) (quoting *Eaddy v. U.S. Bank Nat'l Ass'n*, 119 N.Y.S.3d 212, 214 (N.Y. App. Div. 2020)).  But as *Eaddy* itself makes clear, that broader preclusion principle applies to *res judicata*, not collateral estoppel.  *See generally Mahmood v. Rsch. in Motion Ltd.*, 905 F. Supp. 2d 498, 502 (S.D.N.Y. 2012) ("[C]ollateral estoppel has limitations that do not apply to res judicata.  To be barred by collateral estoppel, an issue must be identical with one actually litigated, actually decided, and necessary to the holding in a previous action.").

      Defendants also argue that *res judicata* bars Counts One to Four, all alleging fraudulent transfer, because the Trustee's claims against Ari and Shoshana were based on the same DCL provisions relied on by Plaintiff here.  *See* Mot. at 15.  For *res judicata* to apply, Defendants must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the same parties or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action."  *Sikorsky v. City of Newburgh*, No. 23-1171-cv, 2025 WL 1271842, at *4 (2d Cir. May 2, 2025).  As the Second Circuit has acknowledged, this "standard *res judicata* analysis can be an awkward fit" when applied to collective and often cooperative bankruptcy proceedings.  *Brown Media Corp. v. K&L Gates, LLP*, 854 F.3d 150, 157–58 (2d Cir. 2017).  As a result, the Court here must "assess[] whether a new action seeks to bring claims that could have been raised and litigated within the scope of the bankruptcy proceeding."  *Id.* at 158.

      In this case, Defendants' argument falters at, minimally, the third prong of the standard *res judicata* analysis, because the claims in the bankruptcy case were not the same as those here.  Defendants explicitly do not claim that *res judicata* bars Counts Five and Six.  *See* Mot. at 16.

13

Nor do they contend that the fraudulent conveyance claims in this case were actually covered by the Settlement Agreement. *See id.* Rather, their argument is that Counts One to Four are "based on the same fraudulent conveyance theories, facts, and statutes" as those compromised in the Settlement Agreement. *Id.* The identity of claims in the two actions "depends in part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." *Monahan v. N.Y.C. Dep't of Corrs.*, 214 F.3d 275, 289 (2d Cir. 2000). Here, the Court concludes that Defendants' thin submission on this issue fails to satisfy their burden of showing that *res judicata* applies, *see Brown*, 854 F.3d at 157. In particular, Defendants point to no case in which a trustee's settlement of an adversary proceeding asserting fraudulent conveyance claims was treated as *res judicata* for the purpose of barring subsequent fraudulent conveyance claims against non-debtors. And they never actually explain how *Plaintiff* could have brought these claims in the bankruptcy case. *See Brown*, 854 F.3d at 161–62.

For *res judicata* purposes, it is not enough, as Defendants' argument suggests, "that the two proceedings involved the same parties, similar or overlapping facts, and similar legal issues." *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 369 (2d Cir. 1997). To be sure, there is similarity between the two actions, but each respective claim, which cannot be "broader than the transaction to which it related," is different. *See id.* As mentioned, in this case, the fraudulent transfer claims seek to hold DDAM and Ari liable for transfers out of JC2 and into DDAM. That is a different transaction than the one at issue in the settled adversary proceeding, which involved the transfer of David's interest in DDAM and Shoshana's salary. *See Cameo* Bankr. ECF No. 117 ¶¶ 1, 37. Notably, the complaint in the adversary proceeding did not even mention JC2 nor the transfers from it to DDAM. *Cf. Cho v. Seventh Ave. Fine Foods Corp.*,

14

No. 11-cv-3436, 2016 WL 1717214, at *4 (S.D.N.Y. Apr. 28, 2016) (applying *res judicata* in a civil suit where a prior bankruptcy appeal and complaint in the civil suit "recite[d] precisely the same factual, and significantly overlapping legal, contentions").  At bottom, here, Plaintiff does not seek merely to "avoid the preclusive effect of res judicata by asserting a new theory or a different remedy."  *Brown*, 854 F.3d at 157.  Rather, Plaintiff, as distinct from the Trustee, seeks to prosecute different conduct that it claims harmed it.  *See Criales v. Am. Airlines, Inc.*, 105 F.3d 93, 98 (2d Cir. 1997) ("[I]n properly seeking to deny a litigant two 'days in court', courts must be careful not to deprive him of one.").  *Res judicata* does not apply.

## II. Pleading Adequacy

Counts Five and Six allege aiding and abetting fraud and civil conspiracy, respectively.  As to Count Five, under New York law, "[t]o plead properly a claim for aiding and abetting fraud, the complaint must allege:  (1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud."  *ICD Cap., LLC v. CodeSmart Holdings, Inc.*, 842 F. App'x 705, 706 (2d Cir. 2021).  Additionally, "Plaintiffs must allege a defendant's actual knowledge of the underlying fraud and must do so in accordance with the heightened pleading standards of Rule 9(b)."  *Id.*  As to Count Six, "[u]nder New York law, to state a claim for civil conspiracy, a plaintiff must, allege an underlying tort and plead facts sufficient to support an inference of the following elements:  (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury."  *Sadigh v. City of New York*, No. 25-cv-948, 2025 WL 1092842, at *2 (E.D.N.Y. Apr. 11, 2025).  The parties dispute whether Rule 9(b) applies to this claim.  However, Plaintiff appears to have the better of that argument.  *See Hecht*

15

*v. Com. Clearing House, Inc.*, 897 F.2d 21, 26 n.4 (2d Cir. 1990) ("On its face, Rule 9(b) applies only to fraud or mistake, not to conspiracy.").[8] In other words, like for aiding and abetting fraud, the underlying fraud must be pled with particularity, but the conspiracy need not be. Under Rule 9(b), Plaintiff "must state with particularity the circumstances constituting fraud." Defendants seek dismissal of these two counts, claiming that they are inadequately pled under Rule 9(b)'s heightened pleading standard. *See* Mot. at 16–17. They further argue that these two claims fail because Plaintiff fails to plead an underlying tort. *See id.* at 18–19. Neither argument has merit.

        A.      Rule 9(b)

Defendants present an assortment of disparate arguments to support their assertion of inadequate pleading. Although they say these arguments relate to both counts, they analyze only aiding and abetting; nevertheless, to the extent their claims are meant to attack the conspiracy count as well, they fail for the same reasons. First, Defendants argue that the Complaint lacks "specifics" with respect to how David and Shoshana substantially assisted the fraud, calling the allegations "vague and conclusory." Mot. at 17. But those bold characterizations dissolve on contact with the Complaint. Specifically, Plaintiff alleges, among other things, that DDAM and Ari entered into a fake Exclusivity Agreement with David to conceal the movement of funds out of JC2, *see* Compl. ¶ 79; that Ari and Shoshana were signatories on DDAM's bank accounts and therefore controlled the movement of funds in and out of it at the time of the alleged hit-and-run scheme, *see id.* ¶ 22; and that both personally benefitted from transfers out of DDAM, *see, e.g.*, *id.* ¶¶ 65–68. The Complaint also specifically alleges that these actions aided the underlying

---

[8]     Defendants' authority, *Langer v. Paysafe Partners LP*, No. 19-cv-4388, 2022 WL 2467617, at *8–9 (E.D.N.Y. Mar. 2, 2022), *report and recommendation adopted*, 2022 WL 4662795 (E.D.N.Y. Sept. 30, 2022), is inapposite on this issue because it does not stand for the principle that Rule 9(b) attaches to all elements of a civil conspiracy claim.

16

fraud by leaving JC2 undercapitalized and unable to refund customers, forcing Amazon to issue refunds directly. *See id.* ¶¶ 143, 148. These allegations are more than enough to satisfy the relevant pleading standard.[9]

Defendants also argue with respect to the aiding and abetting claim that Plaintiff's injury was not reasonably foreseeable to Ari and Shoshana, who engaged only in "passive conduct." *See* Mot. at 17–18. In other words, only David was responsible for the alleged injury to Plaintiff. *See id.* That view relies on a strained reading of the Complaint. As just explained, the Complaint specifically explains how Defendants' conduct left JC2 unable to issue refunds and, therefore, left Amazon on the hook for those refunds. Plaintiff has therefore plausibly alleged that Plaintiff's injury was at least reasonably foreseeable, if not certain.

Defendants make additional arguments which, read liberally, suggest an issue with how knowledge of the fraud is pled. Specifically, they say the Complaint "does not identify which conduct was allegedly fraudulent" and "does not explain why Ari's and [Shoshana]'s actions amount to fraud." Mot. at 17. The first argument is not persuasive because, as discussed in more detail below, the Complaint very clearly identifies the underlying fraud as David's alleged hit-and-run scheme. *See* Compl. ¶ 1. The second argument misunderstands the elements of an aiding and abetting claim, which is not a direct fraud claim. As such, Plaintiff just needs to adequately plead substantial assistance, which, for the reasons just explained, it has sufficiently

---

[9] Defendants argue in a footnote that "[t]he mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff," and that no such duty runs from Ari and Shoshana to Plaintiff. Mot. at 17 n.3 (quoting *Vasquez v. Hong Kong & Shanghai Banking Corp.*, No. 18-cv-1876, 2019 WL 2327810, at *18 (S.D.N.Y. May 30, 2019)). But, as just discussed, Plaintiff's theory of liability does not hinge on Ari's and Shoshana's inaction; much to the contrary, the Complaint alleges that they were active participants in David's fraud. No fiduciary duty requirement applies.

done.[10]  To the extent Defendants are trying to argue here that the Complaint fails to adequately allege knowledge of David's fraud under Rule 9(b), Plaintiff comfortably clears that hurdle, too, by alleging control over and knowledge of the transfers out of DDAM and the receipt of extensive benefits from the funds originating from Amazon via JC2.  In the Court's view, these facts did not just create suspicion of fraudulent activity; rather, they lead to a "strong inference" of actual knowledge.  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292–93 (2d Cir. 2006).

        B.      *Underlying Tort*

Defendants present various arguments concerning the requirement to plead an underlying tort for both the aiding and abetting and conspiracy counts.  *See* Mot. at 18–19.  First, they say that "if the fraudulent transfer claims are subject to dismissal[,] . . . then Plaintiff's remaining causes of action cannot survive."  *Id.* at 19.  That argument is unavailing.  The fraudulent transfer claims are not subject to dismissal.  And, in any event, the alleged underlying tort for both Counts Five and Six is David's fraud, not the alleged fraudulent transfers at issue in this action.  *See* Compl. ¶¶ 133, 146.[11]  Second, Defendants pivot to the allegations concerning David's fraud.  But, on this front, they just assert that "the [C]omplaint does not plead any claim against David."  Mot. at 19.  That perfunctory argument is unconvincing.  The Complaint describes David's alleged fraud in detail.  That is especially so here, where the Complaint explicitly refers

---

[10]     For the same reason, Defendants err when they try to fault the Complaint for "not detail[ing] any statements or actions by Ari and [Shoshana]."  Mot. at 17 (citing *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160 (2d Cir. 2015)).  As stated, the Complaint does detail "actions," and Rule 9(b)'s requirement that a complaint "detail the statements (or omissions) that the plaintiff contends are fraudulent" apply to a claim of fraud itself, which Plaintiff does not lodge against Ari and Shoshana.  *See Loreley*, 797 F.3d at 171.

[11]     This is also fatal to Defendants' argument that the aiding and abetting claim must be dismissed because "a creditor cannot seek monetary damages against a party on an aiding and abetting theory of fraudulent conveyance."  Mot. at 19–20 (quoting *Jiao v. Chulaizhadao Inc.*, No. 21-cv-05002, 2022 WL 4096182, at *3 (E.D.N.Y. Sept. 7, 2022)).  The claim is not that Defendants aided and abetted a fraudulent conveyance, but rather David's actual fraud.

to the bankruptcy court's ruling that David committed the fraud. *See* Compl. ¶ 86. Defendants appear to take issue with the fact that Plaintiff does not literally "plead" the fraud claim against David. *See* Reply at 8. But that formalism is not itself a pleading requirement. Plaintiff just needs to plead the "existence of an underlying tort." *See ICD*, 842 F. App'x at 706. It has.

### III.  Duplicity

Defendants argue that Count Six for conspiracy should be dismissed as duplicative of Count Five for aiding and abetting. *See* Mot. at 20. Plaintiff appears to concede that it will not ultimately be able to sustain both claims but retorts that it is permitted to plead in the alternative under Rule 8(d)(2) and that dismissal at this juncture is premature. *See* Opp. at 31; *see Fezzani v. Bear, Stearns & Co.*, No. 99-cv-0793, 2023 WL 4625544, at *4 (S.D.N.Y. July 19, 2023) ("In cases where plaintiffs' aiding and abetting claims overlap with their conspiracy claims, New York courts have allowed the aiding and abetting claims to proceed but have dismissed as duplicative the conspiracy claims."). The Court agrees with Plaintiff. Where the elements of the two claims alleged to be duplicative are "distinct," even if they actually operate in an "indistinguishable" manner, dismissal on duplicity grounds is inappropriate at this stage. *See M&A Metal, Inc. v. Fina*, No. 21-cv-5570, 2023 WL 2734794, at *7 (E.D.N.Y. Mar. 31, 2023). This course is especially appropriate here given the Second Circuit's recent warning against the inappropriate "'judicial merger' of civil conspiracy and aiding and abetting." *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 81 (2d Cir. 2023). Plaintiff should be permitted to try to prove up the different elements of these claims with the benefit of discovery.

*     *     *

## **CONCLUSION**

For the above reasons, Defendants' motion to dismiss is denied.

SO ORDERED.

*/s/ Hector Gonzalez*
HECTOR GONZALEZ
United States District Judge

Dated:  Brooklyn, New York
        May 21, 2025